## Potter v. Potter's Ex'r et al.

March 16, 1943.

Clyde L. Miller for appellant.

C. F. See, Jr., for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Reversing.

On December 16, 1926, John M. Potter, who died in 1936, executed an $800 note and a mortgage to secure the payment of same to D. D. Potter, the appellant herein, and wife of Isaac Potter, brother of John. The mortgage covered approximately 100 acres of land situated in Lawrence County which had been conveyed to John by his father in 1921. The note and mortgage were prepared and signed in the office of the county clerk of Greenup County, and a deputy clerk of that county took John's acknowledgment to the mortgage on December 17th. By his last will and testament John devised the land in question to Ethel Potter, wife of another brother, Martin, and to a son of that couple. Martin Potter was designated as the executor of the will and qualified as such. We gather from the evidence that the appellant attempted to collect the debt against John sometime prior to his death, but that action seems to have been abandoned, and in April, 1938, she filed this action in equity against Martin Potter, individually, and as executor of John's estate, and Martin's wife and son to enforce the collection of her debt. Among the defenses were the pleas that John's mind was deranged in 1926, and that there was no consideration for the note and mortgage. The claim was also made that the appellant had received rents from the farm which should have been credited on the debt.

The judgment in favor of the appellees recites:
"This mortgage and note were executed soon after John Potter had received nearly $400 from his father's estate and it is claimed that the mortgage executed by D. D. Isaac Potter for $200 in July, 1926, was given to obtain money for John. In his deposition given in Louisa, Isaac Potter denies he re-

ceived any rent money except $20 and later after Carey testified he paid him three years rent of $100.00 each less $22 in one year, he testifies in rebuttal that he did receive the rent. John was drunk nearly all the time and told Isaac in the presence of others that the mortgage was bogus. I am convinced there was no consideration for the mortgage.''

The appellant insists that the burden of proof on the question of lack of consideration was upon the appellees and that they failed to sustain it. We are reluctant to disturb the finding of the chancellor in a proceeding such as this, and we will not do so where we entertain no more than a doubt as to the correctness of his ruling. Hopper v. Beddow, 283 Ky. 337, 141 S. W. (2d) 278. We are forced to the conclusion, however, from our examination of the evidence, that the chancellor erred in his finding, because the appellees failed to sustain the burden of proof. Cheney's Adm'r v. Houston, 238 Ky. 410, 38 S. W. (2d) 198.

Isaac Potter appears to have acted as the agent for his wife when most of the transactions referred to in the evidence took place. He was present when the note and mortgage were executed. He said that his wife had loaned John money on several occasions, and those previous loans, and an additional amount which was loaned at the time of the execution of the note and mortgage, made up the $800. He said also that $200 had been borrowed by himself and his wife and loaned to John in July, 1926, and that John used the borrowed money to support his six children after his wife left him sometime around 1925. The appellees insist that Isaac's deposition failed to support the appellant's contention that $800 was actually loaned to John, but we do not so interpret the deposition. While Isaac's recollection on certain questions seems not to have been so good, he did state positively that the sum of $800 was loaned to John by his wife.

The testimony for the appellees is that John received approximately $400 from his father's estate early in 1926, and, therefore, did not have to borrow money from the appellant to support his children; that he had been working for good wages prior to the time he returned to Lawrence County in 1926; that when Isaac approached him about the note he said that it was a

bogus one and that he was not going to pay it; and that Isaac replied that he knew it was bogus, but he thought he could settle it for half. Isaac denied this conversation and also that he had collected rents from the property for 1930, 1931 and 1932, except in the amount of approximately $20. After Bill Carey, the tenant, testified positively that the rents for the three years were paid to Isaac with John's approval, aside from some $22 which he applied on taxes, Isaac said in a second deposition that he had collected something over $100 in rents, but that he had paid taxes and other expenses with the amounts collected and that he and his wife had received no benefit whatever from the rents.

Bill Carey's testimony impresses us more favorably than that of any other witness. He said that, after hearing Isaac and his wife were offering the mortgage for sale, he talked with John and Martin about it; that Martin said a man would be getting in trouble to fool with it; that John said he did not owe the debt, and that "he went down and worked for him (Isaac) for three or four or five years running his still and got caught and took the rap for him"; and that John did not have any recollection of signing the note and mortgage. The appellees failed to offer any explanation as to why John authorized Isaac to collect the rents for 1930, 1931 and 1932, and it can be noted from Carey's testimony that, while John said that he did not owe the mortgage, he went on to explain why he took that position.

We are convinced that there were monetary transactions between John and Isaac and his wife, and also that Isaac was acting as agent for his wife. John got into trouble sometime prior to 1930 for making whiskey. It appears that he was drinking heavily at that time and began doing so again shortly after he got out of the penitentiary. We are convinced also that his mind was in a weakened condition for some time prior to his death in 1936; but the record fails completely to show that he lacked mental capacity to execute the note and mortgage in December, 1926. Even if John did get approximately $400 from his father's estate early in 1926, this fact would not overcome Isaac's testimony that his wife loaned John money from time to time prior to the execution of the $800 note in December of that year. We think the fact that John authorized Isaac to collect the aforementioned rents is a strong circumstance in favor

of the appellant. But, since Isaac was acting as her agent in all these transactions, we think she should be charged with the rents collected by Isaac. The property was being rented to Carey for $100 a year. Carey said that he paid Isaac the rents for three years, less the $22 which he applied on the taxes. While Isaac denies receiving this amount, and while he said that he and his wife received no benefit from the rents, we think it only fair to allow a credit of $278 on the $800 note. This amount should be applied on the interest.

Wherefore, the judgment is reversed, with directions to set it aside and for the entry of a judgment in conformity with this opinion.